## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS

Gregory A. McVay (N-13510),⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀Plaintiff,⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)⠀⠀⠀⠀Case No. 18 CV 6244
⠀⠀⠀⠀⠀⠀⠀v.⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)⠀⠀⠀⠀Hon. Nancy L. Maldonado
Ghaliah Obaisi, et al.,⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀Defendants.⠀⠀⠀)

## MEMORANDUM OPINION AND ORDER

Gregory A. McVay, now a prisoner at Hill Correctional Center, brings this civil rights action, 42 U.S.C. § 1983, alleging inadequate treatment for a right knee injury while he was confined at Stateville Correctional Center. Now before the Court is the summary judgment motion of Defendants Wexford Health Sources, Inc. ("Wexford"), and Ghaliah Obaisi, as Independent Executor of the Estate of Saleh Obaisi, M.D. ("Dr. Obaisi"). Defendants argue that: (1) Dr. Obaisi was not deliberately indifferent to Plaintiff's knee injury; (2) Plaintiff has not demonstrated that he was injured due to a policy or widespread practice of Wexford; and (3) Plaintiff is barred from recovering punitive damages from Dr. Obaisi's estate. Plaintiff, who is proceeding pro se, has responded to the motion, and Defendants have replied. For the reasons stated, Defendants' motion is granted.

## BACKGROUND

### I.⠀⠀⠀Northern District of Illinois Local Rule 56.1

Local Rule 56.1 governs the procedures for filing and responding to motions for summary judgment in this Court. The rule is intended "to aid the district court, which does not have the advantage of the parties' familiarity with the record and often cannot afford to spend the time combing the record to locate the relevant information, in determining whether a trial is necessary."

*Delapaz v. Richardson*, 634 F.3d 895, 899 (7th Cir. 2011) (internal quotation marks omitted). Local Rule 56.1(a)(2) requires the moving party to provide a statement of material facts that complies with Local Rule 56.1(d). Local Rule 56.1(d) requires that "[e]ach asserted fact must be supported by citation to the specific evidentiary material, including the specific page number, that supports it. The court may disregard any asserted fact that is not supported with such a citation." LR 56.1(d)(2).

The opposing party must then respond to the movant's proposed statements of fact. *Schrott v. Bristol-Myers Squibb Co.*, 403 F.3d 940, 944 (7th Cir. 2005); LR 56.1(e). In the case of any disagreement, "a party must cite specific evidentiary material that controverts the fact and must concisely explain how the cited material controverts the asserted fact. Asserted facts may be deemed admitted if not controverted with specific citations to evidentiary material." LR 56.1(e)(3). "[M]ere disagreement with the movant's asserted facts is inadequate if made without reference to specific supporting material." *Smith v. Lamz,* 321 F.3d 680, 683 (7th Cir. 2003).

Because Plaintiff is proceeding pro se, Defendants served him with a Notice to Unrepresented Litigants Opposing Summary Judgment, as required by Local Rule 56.2. (Dkt. 139.)[1] Plaintiff responded by filing a response to Defendants' statement of facts (Dkt. 143), a statement of additional material facts (Dkt. 144), a memorandum opposing the motion (Dkt. 145), and an "affidavit" (Dkt. 146).[2] Defendants then responded to Plaintiff's statement of additional material facts. (Dkt. 154.)

---

[1] In subsequent citations to the record, referenced page numbers are taken from the CM/ECF header.

[2] As discussed below, the "affidavit" is not notarized and does not comport with the signature and date requirements of 28 U.S.C. § 1746 to be considered a declaration under that statute.

Where Plaintiff has not properly responded to a certain fact or has admitted it, the Court will accept it as true to the extent supported by the record. *See Lamz*, 321 F.3d at 683 (7th Cir. 2003). Certain of Plaintiff's factual assertions do not conform to the Local Rules in that he does not include the evidentiary material supporting his statements of fact.[3] *See* LR 56.1(a)(2), (b)(3), (d)(3). Nonetheless, while the Court may demand strict compliance with Local Rule 56.1, *see Stevo v. Frasor*, 662 F.3d 880, 886–87 (7th Cir. 2011), it will generously construe the facts identified by Plaintiff to the extent they are supported by the record. *See Gray v. Hardy*, 826 F.3d 1000, 1005 (7th Cir. 2016) (courts may construe pro se submissions leniently). The Court, however, will not look beyond the cited material. *See Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 898 (7th Cir. 2003) ("[D]istrict courts . . . are not required to scour every inch of the record for evidence that is potentially relevant to the summary judgment motion before them.").

The Court also is mindful that failure to strictly comply with Local Rule 56.1, or indeed to respond at all to a motion for summary judgment, does not automatically warrant judgment in favor of the moving party. *Raymond v. Ameritech Corp.*, 442 F.3d 600, 608 (7th Cir. 2006) (moving party has "ultimate burden of persuasion" to show entitlement to judgment as a matter of law). The Court will apply these standards in evaluating the evidence.

## II.     Relevant Facts

Preliminarily, Defendants have cited an expert report by Dr. Chadwick C. Prodromos, an orthopedic surgeon, in support of certain factual contentions. (*See* Dkt. 137-4.) Plaintiff correctly points out (*see* Pl.'s Resp. to Defs.' SOF, Dkt. 143 ¶ 13) that the report is not accompanied by a supporting affidavit verifying its authenticity, and thus cannot be considered on summary

---

[3] In particular, and as discussed below, Plaintiff cites certain deposition testimony that he has not provided to the Court, and at times refers to an "Exhibit 2," which appears to be a reference to his medical records filed as an exhibit to Defendants' motion for summary judgment. (*See* Dkt. 137-2.)

judgment. *See Scott v. Edinburg*, 346 F.3d 752, 759–60 (7th Cir. 2003) (finding expert report introduced without authenticating affidavit was inadmissible and could not be considered on summary judgment); *see also Neal v. Indianapolis Fire Dep't*, No. 1:20-cv-02921, 2022 WL 2106143, at *1 (S.D. Ind. June 10, 2022) ("Unauthenticated evidence is inadmissible and may not be considered in evaluating a motion for summary judgment."); *Wooten v. Taking Care of Our Seniors, Inc.*, No. 1:17-cv-05570, 2022 WL 1663417, at *3–4 (N.D. Ill. May 25, 2022) (unauthenticated expert report could not be considered on summary judgment and could not be considered a declaration under 28 U.S.C. § 1746 because it did not substantially follow prescribed form and was not signed under penalty of perjury). For these reasons, the Court will not consider the unauthenticated expert report by Dr. Prodromos in setting forth the relevant facts or ruling on this motion.

Plaintiff, Gregory McVay, was at all relevant times a prisoner in the custody of the Illinois Department of Corrections, housed at Stateville Correctional Center. (Defs.' SOF, Dkt. 137 ¶¶ 1–2.) Plaintiff has no medical training. (*Id.* ¶ 3.) Defendant Wexford Health Sources, Inc., is a private corporation that has contracted with the State of Illinois to provide medical treatment to prisoners. (*Id.* ¶ 4.) The late Dr. Saleh Obaisi was at all relevant times employed as the onsite medical director for Stateville Correctional Center. (*Id.* ¶ 5.)[4]

In approximately July of 2015, Plaintiff began to complain of knee pain following an injury he sustained while playing handball. (*Id.* ¶ 6.) Plaintiff did not complain to medical staff when the injury initially occurred, but instead ran his knee under hot and cold water in his cell. (*Id.* ¶ 7.)

---

[4] Because Dr. Obaisi is deceased, he is sued through the estate in his individual capacity. (*See* Pl.'s 2d Am. Compl., Dkt. 18 ¶ 2.)

Plaintiff initially did not think the injury warranted immediate medical treatment. (*See* Pl.'s Resp. to Defs.' SOF, Dkt. 143 ¶ 7.)

On Aug. 26, 2015, Plaintiff had an annual physical at Stateville, at which point he notified Physician's Assistant LaTanya Williams ("P.A. Williams") that he had injured his right knee. (*See* Pl.'s SOAF, Dkt. 144 ¶¶ 1–2.) P.A. Williams ordered a knee sleeve for Plaintiff. (*Id.* ¶ 3.)

On Jan. 6, 2016, Plaintiff presented at nurse sick call with complaints of right knee pain. (Defs.' SOF, Dkt. 137 ¶ 8; *see also* Pl.'s SOAF, Dkt. 144 ¶ 4.) Plaintiff described the pain as constant and throbbing. (Defs.' SOF, Dkt. 137 ¶ 8.) The pain was rated as a "six" on a scale of one to 10. (*Id.*) The medical records from this January 6, 2016, visit state that the injury occurred on January 3, 2016, because of "sports," but also note that Plaintiff had complained of a similar injury three months prior. (*Id.* ¶ 9; Dkt. 137-2 at 1.) The nurse observed that there was no swelling of the right knee and no loss of function. (*Id.*) It was recommended that Plaintiff receive an x-ray. (*Id.*) Plaintiff returned to nurse sick call on Jan. 26, 2016, again complaining of knee pain and inquiring about the results of his x-ray. (*See* Pl.'s SOAF, Dkt. 144 ¶ 6.)

On Jan. 29, 2016, Plaintiff saw P.A. Williams with complaints of chronic right knee pain. (*See* Defs.' SOF, Dkt. 137 ¶ 10; *see also* Pl.'s SOAF, Dkt. 144 ¶ 7.) At this time, Plaintiff stated that his knee pain began in August 2015. (Defs.' SOF, Dkt. 137 ¶ 10.) Plaintiff reiterated that he plays handball but stated that he had been "babying" the knee and that lateral movement bothered him during the activity. (*Id.*) P.A. Williams discussed the x-ray results with Plaintiff, continued his medications, and referred him to Dr. Obaisi for further evaluation. (*Id.* ¶ 11.)

At this appointment, Plaintiff asked P.A. Williams for an MRI. (*See* Pl.'s SOAF, Dkt. 144 ¶ 8.) The record reflects, however, that P.A. Williams did not have the authority to order an MRI. (*See* Defs.' Resp. to Pl.'s SOAF, Dkt. 154 ¶ 8.) P.A. Williams testified that while she did not

5

know "verbatim" Wexford's policies related to referrals, the medical director (Dr. Obaisi) could have referred Plaintiff for an MRI at any time his evaluation of Plaintiff indicated that such a referral was needed. (*See* Pl.'s SOAF, Dkt. 144 ¶ 17; Williams Dep., Dkt. 137-3 at 43:8–45:24.)

On Feb. 11, 2016, Plaintiff was seen by Dr. Obaisi for the first time regarding his knee. (Defs.' SOF, Dkt. 137 ¶ 12; *see* Pl.'s Resp to Defs.' SOF, Dkt. 143 ¶ 12.) At this time, Plaintiff complained of right knee pain after playing handball and indicated that he had pain on exertion. (Defs.' SOF ¶ 12; Pl.'s Resp to Defs.' SOF ¶ 12.) Dr. Obaisi diagnosed Plaintiff with a knee sprain and scheduled him for a steroid injection to the medial collateral ligament. (Defs.' SOF ¶ 12; Pl.'s Resp to Defs.' SOF ¶ 12; *see* Dkt. 137-2 at 4.)

According to Plaintiff, he told Dr. Obaisi at this initial visit that he felt "tearing" in his knee when the injury occurred and requested an MRI. (*See* Pl.'s SOAF, Dkt. 144 ¶¶ 9–10.) Plaintiff contends that Dr. Obaisi told him they would try a cortisone injection first because an MRI had to be approved by other people, and it would not be approved unless they tried other methods first. (*Id.* ¶ 11.)[5] On Feb. 17, 2016, Plaintiff received an injection of 40 mg of Depo-Medrol to the right knee.[6] (Defs.' SOF, Dkt. 137 ¶ 13.)

On May 11, 2016, Plaintiff was seen at nurse sick call for complaints of pain in his right knee. (*See id.* ¶ 14; Pl.'s Resp. to Defs.' SOF, Dkt. 143 ¶ 14.) The nurse observed Plaintiff's gait,

---

[5] Plaintiff has submitted an "affidavit" in support of these statements that is not notarized and which is more in the nature of a declaration under 28 U.S.C. § 1746. (*See* Dkt. 146 at 1–7.) The declaration, however, does not comport with the requirements of that statute, most importantly because it is not signed. The Court will consider these statements, however, because they are supported by Plaintiff's deposition testimony. (*See* Pl.'s Dep., Dkt. 137-1 at 66:22–67:6, 138:15–139:6.)

[6] Contrary to Plaintiff's assertion (Dkt. 143 ¶ 13), the fact that Plaintiff received this injection and use of Depo-Medrol are adequately supported without the expert report of Dr. Prodromos. (*See* Dkt. 137-2 at 5; Pl.'s Dep., Dkt. 137-1 at 45:22–24, 46:1–8; Williams Dep., Dkt. 137-3 at 28:10–21.) Depo-Medrol is used to treat inflammation and relieve swelling. *See* Fed. R. Evid. 201(b)(2); *Drugs and Supplements: Methylprednisolone (Injection Route)*, Mayo Clinic (Feb. 1, 2023), https://www.mayoclinic.org/drugs-supplements/methylprednisolone-injection-route/description/drg-20075216; *Methylprednisolone: Mechanism of Action*, Merck Manual Professional Version, https://www.merckmanuals.com/professional/SearchResults?query=%22depo-medrol%22&page=1 (last visited March 24, 2023).

which she noted was steady. (Defs.' SOF ¶ 14; Pl.'s Resp. to Defs.' SOF ¶ 14.) Plaintiff could walk without assistance, had a full range of motion, and had no swelling, although the nurse did note some tenderness on physical examination. (Defs.' SOF ¶ 14; Pl.'s Resp. to Defs.' SOF ¶ 14.) Although the medical records do not reflect this, Plaintiff contends that he told the nurse at this time that his knee was getting worse. (Pl.'s SOAF, Dkt. 144 ¶ 12; *see* Pl.'s Dep., Dkt. 137-1 at 48:2–24.)

Plaintiff was next seen by P.A. Williams on May 13, 2016. (*See* Defs.' SOF, Dkt. 137 ¶ 15.) He complained of recurrent pain in his right knee. (*Id.*) Plaintiff also stated that he had not been compliant with taking Naproxen, which had been prescribed to Plaintiff by P.A. Williams in January 2016. (*Id.*) Plaintiff stated that the steroid injection "reduce[d] the pain a little bit" and requested another one. (*See* Defs.' SOF ¶ 16; Pl.'s Resp. to Defs.' SOF ¶ 16.) Plaintiff stated that he had been playing handball because it was his only form of exercise. (*Id.*)

P.A. Williams observed that Plaintiff's gait was within normal limits but his knee was tender to the touch. (*See* Defs.' SOF ¶ 17.) P.A. Williams prescribed Mobic and referred Plaintiff for another visit with Dr. Obaisi. (*Id.*; *see* Pl.'s Resp. to Defs.' SOF ¶ 17; Williams Dep., Dkt. 137-3 at 37:17–24.)

On May 23, 2016, Dr. Obaisi saw Plaintiff for a follow-up visit from P.A. Williams' referral. (Defs.' SOF ¶ 18.) Plaintiff advised Dr. Obaisi that the pain in his right knee was back. (*Id.*) Dr. Obaisi performed an examination, at which point he diagnosed Plaintiff with bursitis and tendonitis. (*Id.*) Dr. Obaisi ordered Plaintiff a knee sleeve and Plaintiff received another Depo-Medrol injection.[7] (*Id.*)

---

[7] While Plaintiff correctly states that Dr. Obaisi's notes are difficult to read, particularly as to the type of injection received, P.A. Williams describes this as a Depo-Medrol and Lidocaine injection. (*See* Williams Dep., Dkt. 137-3 at 42:4–8.)

Plaintiff contends that he again asked Dr. Obaisi for an MRI at this evaluation, but Dr. Obaisi told him that the injury was a sprain and no MRI was needed. (*See* Pl.'s SOAF, Dkt. 144 ¶ 14; *see* Pl.'s Dep., Dkt. 137-1 at 140:6–16.) He further contends that Dr. Obaisi told him that he would set a follow-up appointment for six months out, although the medical records do not reflect this. (Pl.'s SOAF, Dkt. 144 ¶ 15; *see* Pl.'s Dep., Dkt. 137-1 at 64:11–17.)[8]

On April 18, 2017, Plaintiff was seen at nurse sick call complaining of right knee pain. (Defs.' SOF, Dkt. 137 ¶ 20.) He requested another steroid injection. (*Id.*) A nurse performed a physical examination and noted that there was no crepitus[9] and no limitation on range of motion. (*Id.*) The nurse noted mild swelling, but also that Plaintiff walked with a steady gait and without assistance. (*Id.*)

P.A. Williams saw Plaintiff two days later, on April 20, 2017. (*Id.* ¶ 21.) Plaintiff complained that the pain in his right knee recently returned. (*Id.*) Plaintiff stated that the steroid shot wore off, but it "worked great." (*Id.*) On physical examination, P.A. Williams noted no swelling and no acute findings. (*Id.*) She diagnosed Plaintiff with recurrent right knee pain and referred him to see Dr. Obaisi. (*Id.*)

Plaintiff saw Dr. Obaisi on May 4, 2017. (*Id.* ¶ 22.) Dr. Obaisi did not note any acute findings and assessed Plaintiff with a tender right knee. (*Id.*) He scheduled Plaintiff for another steroid injection. (*Id.*) On May 9, 2017, Plaintiff received the Depo-Medrol injection from Dr. Obaisi. (*Id.* ¶ 23.) Dr. Obaisi also ordered knee sleeves for both of Plaintiff's knees. (*Id.*) Plaintiff

---

[8] Plaintiff testified that at some point in October or November of either 2016 or 2017 (he initially testified it was 2017 and then corrected his testimony to 2016), he stopped a nurse on the gallery concerning his knee and told her that Dr. Obaisi had said he would bring Plaintiff back for a follow-up in six months. The nurse found no notation in the file, but stated that she left a note for Dr. Obaisi. Plaintiff did not know if Dr. Obaisi read that note. (*See* Pl.'s SOAF, Dkt. 144 ¶ 22; Pl.'s Dep., Dkt. No. 137-1 at 72:24–73:18.)

[9] Crepitus is a cracking or clicking sound in a joint that can be associated with various conditions, including osteoarthritis. *See* Alexandra Villa-Forte, *Joint Noises*, Merck Manual: Consumer Version (Feb. 2023), https://www.merckmanuals.com/home/bone,-joint,-and-muscle-disorders/symptoms-of-musculoskeletal-disorders/joint-noises.

contends that he again asked Dr. Obaisi to order an MRI during the May 4, 2017, visit, and during the May 9, 2017, appointment for the steroid injection. (*See* Pl.'s SOAF, Dkt. 144 ¶¶ 18–21.) As of May 4, 2017, P.A. Williams would have considered the knee injury to be a chronic condition. (*Id.* ¶ 19; *see* Defs.' Resp. to Pl.'s SOAF, Dkt. 154 ¶ 19.)

On Nov. 7, 2017, Plaintiff was seen at nurse sick call for complaints of right knee pain. (Defs.' SOF, Dkt. 137 ¶ 24.) Plaintiff stated that his injury occurred two years ago and the pain had been present for two years. (*Id.*) Plaintiff stated that activity precipitates the pain and "cortisone injections" alleviate it. (*Id.*) On physical examination, the nurse did not notice bruising, redness, swelling, or tenderness. (*Id.*) Plaintiff had a full range of motion. (*Id.*)

On Nov. 15, 2017, Plaintiff was seen by P.A. Williams as a referral from sick call. (*Id.* ¶ 25.) Plaintiff complained that it was painful to walk up stairs and that the pain in his knee was intermittent. (*Id.*) After physical examination, P.A. Williams noted that Plaintiff was not wearing his knee support, noted crepitus when touched, and observed that Plaintiff had good range of motion and strength. (*Id.*) P.A. Williams ordered an additional x-ray of the right knee and referred Plaintiff to physical therapy and to Dr. Obaisi. (*Id.*)

Plaintiff had the right knee x-ray on Nov. 17, 2017. (*Id.* ¶ 26.) An "X-Ray Requisition" form indicates that the knee had minimal wear-and-tear spurring of the patella and otherwise appeared normal. (*See* Dkt. 137-2 at 60.)

On Dec. 11, 2017, Plaintiff again saw Dr. Obaisi, complaining of swelling in his right knee. (*See* Defs.' SOF, Dkt. 137 ¶ 28.) Dr. Obaisi put in for a collegial review to discuss referring Plaintiff for an orthopedic evaluation.[10] (*Id.*; *see* Dkt. 137-2 at 45 ("Medical Special Services

---

[10] "Wexford's collegial review board is a board of doctors who review and approve medical requests." *White v. Woods*, 48 F.4th 853, 857 n.1 (7th Cir. 2022). The policy "requires Wexford's corporate office to preapprove offsite care." *Id.* (quoting *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 222–23 (7th Cir. 2021)).

Referral and Report").)  At that time, Dr. Obaisi prescribed a right knee sleeve and a low gallery permit.  (Defs.' SOF, Dkt. 137 ¶ 28; *see* Dkt. 137-2 at 72.)

On Dec. 19, 2017, Wexford approved the referral for an orthopedic evaluation.  (Defs.' SOF, Dkt. 137 ¶ 29; *see* Pl.'s SOAF, Dkt. 144 ¶ 24.)  Plaintiff, pointing to the attached medical records, states that Dr. Obaisi diagnosed him on that date with a "meniscus tear."  (*See* Pl.'s SOAF, Dkt. 144 ¶ 26.)  The attached record is a page from a "Medical Special Services Referral and Report."  (Dkt. 137-2 at 46.)  It was signed by Dr. Obaisi and states, "dx-R patella spur, meniscus tear."  (*See id.*; *see also* Williams Dep., Dkt. 137-3 at 75:22–76:15.)

On Dec. 22, 2017, Plaintiff was seen by a physical therapist but did not want to participate in physical therapy until he was evaluated by a specialist, although Plaintiff characterizes this as a request rather than an outright refusal to participate in physical therapy.  (Defs.' SOF, Dkt. 137 ¶ 30; *see* Pl.'s Resp. to Defs.' SOF, Dkt. 144 ¶ 30.)  Dr. Obaisi passed away on Dec. 23, 2017.  (*See* Williams Dep., Dkt. 137-3 at 64:4–6.)

On Jan. 15, 2018, Plaintiff was seen by Dr. Bodner at Midwest Orthopedic Institute, who requested an MRI of Plaintiff's right knee.  (Defs.' SOF, Dkt. 137 ¶ 31.)  At the request of Dr. Bodner, Dr. Obaisi's referral for Plaintiff to receive that MRI was approved by Wexford.  (*Id.* ¶ 32.)  After a delay, that MRI was completed on Feb. 5, 2018, and showed a medial meniscal tear. (*Id.* ¶ 33; *see* Pl.'s SOAF, Dkt. 144 ¶¶ 28–29.)  Specifically, the MRI report stated that Plaintiff had an inferior oblique medial meniscal tear in the posterior horn.  (Defs.' SOF, Dkt. 137 ¶ 33.) There was no displaced fragment, and the medial meniscal root was intact.  (*Id.*)  The report also stated that the ACL and PCL ligaments were intact.  (*Id.*)

On Feb. 21, 2018, Plaintiff saw Dr. Bodner for a follow-up appointment.  (*Id.* ¶ 34; *see* Dkt. 137-2 at 50.)  Dr. Bodner noted a degenerative type of tear in the medial meniscus with a

"very tight knee." (Defs.' SOF, Dkt. 137 ¶ 34.) Dr. Bodner also stated that it appeared that Plaintiff had a partial ACL tear that the radiologist did not catch. Dr. Bodner then discussed with Plaintiff his recommendation that Plaintiff avoid an ACL reconstruction and recommended an arthroscopic surgery.[11] (*Id.*; *see* Dkt. 137-2 at 50.)

On March 22, 2018, Plaintiff had a right knee partial meniscectomy with chondral shaving of the medial femoral condyle. (Defs.' SOF, Dkt. 137 ¶ 35.) The preoperative diagnosis was a right knee with a medial meniscal tear with possible ACL degenerative sprain. (*Id.*) However, the post-operative diagnosis indicated that the ACL was intact and that Plaintiff had a "posterior horn tear, complex horizontal cleavage type medial meniscus." (*Id.*; *see* Dkt. 137-2 at 87–89.)

On direct examination, Dr. Bodner found that Plaintiff had "horizontal delamination and degeneration of the posterior horn." (*Id.* ¶ 36.) He found there was "no significant tear of the lateral meniscus and no loose bodies, and the articular surface was intact." (*Id.*; *see* Dkt. 137-2 at 87–88.)

Following the surgery, Plaintiff stated that he still felt as he did before the surgery and his knee was in "bad shape." (*Id.* ¶ 37; *see* Pl.'s Dep., Dkt. 137-1 at 88:21–89:9.) Plaintiff attributes this to a partial ACL tear based on Dr. Bodner's initial diagnosis, although as noted above, Dr. Bodner found the ACL was intact during surgery. (Defs.' SOF, Dkt. 137 ¶ 37; *see* Pl.'s Dep., Dkt. 137-1 at 88:21–89:24.)

On March 30, 2018, Plaintiff saw Dr. Okezie for a postoperative follow-up and advised Dr. Okezie that his knee felt unstable. (Pl.'s SOAF, Dkt. 144 ¶ 33.) Dr. Okezie noted at that time

---

[11] Plaintiff initially disputes this description of his follow-up appointment with Dr. Bodner (*see* Pl.'s Resp. to Defs.' SOF, Dkt. 143 ¶ 34), but this description is consistent with Plaintiff's testimony as to what Dr. Bodner told him (*see* Pl.'s Dep., Dkt. 137-1 at 87:1–88:16) and his own Statement of Additional Facts (*see* Dkt. 144 ¶ 31).

that the "MRI done by Ortho showed partial tear of ACL in R knee."[12]  (*Id.* ¶ 34.) Based on his

unsigned affidavit, Plaintiff contends that on that same date, Dr. Funk, Wexford's Regional

Medical Director, was present, reviewed Plaintiff's medical records, and informed him, "We do

nothing for ACL tears."  (*Id.* ¶ 35.)  As noted above, the affidavit is not notarized and does not

comport with 28 U.S.C. § 1746.  Defendants point out that Plaintiff's medical records do not reflect

that Dr. Funk was present at this appointment.  (*See* Defs.' Resp. to Pl.'s SOAF, Dkt. 154 ¶ 35.)

Plaintiff contends that in accordance with Wexford guidelines, Dr. Obaisi should have

referred him for collegial review after six weeks of the onset of his injury.  (Pl.'s SOAF, Dkt. 144

¶ 36.)  But while Plaintiff cites to the deposition of Dr. Neil Fisher, who testified on behalf of

Wexford, he does not provide the cited portion of the deposition concerning this testimony.  He

also cites portions of Dr. Fisher's testimony concerning the collegial review process and asserts

that Dr. Obaisi could have scheduled Plaintiff for specialized care without a collegial review, but

did not attach the relevant pages from Dr. Fisher's deposition, so the Court cannot consider these

facts.  (*See id.* ¶¶ 37–38.)

## DISCUSSION

### I.    Summary Judgment Standard

On summary judgment, the Court must view the record in the light most favorable to the

non-moving party and grant the motion if "the movant shows that there is no genuine dispute as to

any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a);

*see also Gupta v. Melloh*, 19 F.4th 990, 997 (7th Cir. 2021).  Summary judgment is warranted

"against a party who fails to make a showing sufficient to establish the existence of an element

---

[12] This is apparently a reference to the Feb. 5, 2018, MRI (completed prior to Plaintiff's surgery in which Dr. Bodner found the ACL intact), as the record does not contain a reference to any additional MRI results.

that is essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The parties seeking summary judgment bear the initial burden of showing the grounds for their motion. *Id.* at 323. Once they have done so, "the burden shifts to the non-moving party to provide evidence of specific facts creating a genuine dispute." *Carroll v. Lynch*, 698 F.3d 561, 564 (7th Cir. 2012). A factual dispute is genuine when a reasonable jury could return a verdict in favor of the non-moving party. *Id.*

The Court must construe all facts in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party. *See Eaton v. J.H. Findorff & Son, Inc.*, 1 F.4th 508, 511 (7th Cir. 2021). A court's role is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

## II. Legal Standard

The Eighth Amendment prohibits cruel and unusual punishment, protecting inmates from the unnecessary and wanton infliction of pain, including "grossly inadequate medical care." *Pyles v. Fahim*, 771 F.3d 403, 408 (7th Cir. 2014) (citing *Estelle v. Gamble,* 429 U.S. 97, 103–04 (1976)). "The burden is on the prisoner to demonstrate that prison officials violated the Eighth Amendment, and that burden is a heavy one." *Id.* at 408–09 (citing *Whitley v. Albers,* 475 U.S. 312, 325 (1986)).

To prevail on a medical deliberate indifference claim under the Eighth Amendment, a plaintiff must demonstrate that he suffers from an objectively serious medical condition. *Id.* at 409 (citing *Arnett v. Webster,* 658 F.3d 742, 750 (7th Cir. 2011)). Second, a plaintiff must show that the defendant prison treater knew of the condition and the risk it posed, but disregarded that risk. *Id.* This state-of-mind requirement is examined subjectively, meaning the defendant must

know of facts from which he could infer a substantial risk of serious harm, and he must actually draw that inference. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016). While a prisoner need not show that he was "literally ignored," he must show that the defendant's response was "so plainly inappropriate as to permit the inference that the defendant[] intentionally or recklessly disregarded his needs." *Hayes v. Snyder*, 546 F.3d 516, 524 (7th Cir. 2008). This requires a showing of something more than negligence or medical malpractice. *Pyles*, 771 F.3d at 409.

"Assessment of the subjective prong is more difficult in cases alleging inadequate care as opposed to a lack of care." *Munson v. Ahmed*, No. 18-cv-2216-DWD, 2022 WL 747444, at *8 (S.D. Ill. Mar. 11, 2022) (citing *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016)). "[W]ithout more, a mistake in professional judgment cannot be deliberate indifference." *Whiting*, 839 F.3d at 662 (observing that "[a] doctor who claims to have exercised professional judgment is effectively asserting that he lacked a sufficiently culpable mental state, and if no reasonable jury could discredit that claim, the doctor is entitled to summary judgment") (citation omitted).

A jury may infer deliberate indifference, however, if a treatment decision is "so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 241 (7th Cir. 2021) (quoting *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006)). But an inmate is not entitled to specific care of his choice, and a "disagreement over a course of treatment does not establish a constitutional violation." *Grant v. Heidorn*, 802 F. App'x 200, 205 (7th Cir. 2020) (unpublished); *see Pyles*, 771 F.3d at 409 ("Disagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to

establish an Eighth Amendment violation.").  Finally, even if a plaintiff can show deliberate indifference he also must show that the defendant's actions caused the delay in treatment, and that the delay exacerbated his injury or unnecessarily prolonged his pain.  *Dean*, 18 F.4th at 242.

In regard to Wexford, the liability of a private corporation acting under color of state law is evaluated under the standard that applies to municipalities.  *Id.*  at 235 (citing *Iskander v. Vill. of Forest Park*, 690 F.2d 126, 128 (7th Cir. 1982)).  "Municipalities are not vicariously liable for the constitutional torts of their employees or agents."  *Id.*  Rather, a municipality is liable under § 1983 only for its own constitutional violations.  *Id.*

To establish such a violation under this standard, a plaintiff must show that he was deprived of a federal right.  *Id.* (citing *First Midwest Bank ex rel. LaPorta v. City of Chi.*, 988 F.3d 978, 987 (7th Cir. 2021)).  Beyond that, he must link the deprivation to a policy or custom of the entity, meaning "(1) an express policy that causes a constitutional deprivation when enforced, (2) a widespread practice that is so permanent and well-settled that it constitutes a custom or practice; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority." *Id.*  In sum, the plaintiff must bring forth evidence that the entity's actions caused him to suffer a deprivation of his rights, and that the entity took the action "with conscious disregard for the known or obvious risk of the deprivation."  *Id.* at 236.

## III.    Analysis

First, as to Dr. Obaisi, Plaintiff contends that the medical director knew that Plaintiff experienced a tearing sensation in his knee as of their first visit based on Plaintiff's report of his symptoms, and persisted in a course of treatment he knew was ineffective.  (*See* Pl.'s Mem. in Resp. to Defs.' Mot. for Summ. J., Dkt. 145 at 6–10.)  He further contends that Dr. Obaisi "fail[ed] to document" the diagnosis of a meniscus tear until he sought approval from Wexford for an MRI,

15

and questions whether Dr. Obaisi "kn[e]w from the onset" that Plaintiff had a more serious injury than a sprain, although he does not point to any evidence in the record supporting such an inference. (*See id.* at 11.)

Defendants argue that the record does not support an inference of deliberate indifference by Dr. Obaisi. They argue that between January 2016 and March 2018, Plaintiff was seen by various medical professionals for treatment of his right knee pain more than 20 times. Dr. Obaisi himself treated Plaintiff six times, employing steroid injections, knee supports, a low gallery permit, x-rays, a referral for physical therapy, and ultimately a referral to Dr. Bodner and a referral for an MRI. (*See* Defs.' Mem. in Supp. of Mot. for Summ. J., Dkt. 136 at 7–9.) Defendants contend that Plaintiff's mere disagreement with Dr. Obaisi's course of treatment does not create an issue of fact, that an inmate is not entitled to demand specific care, and that the totality of treatment provided to Plaintiff does not support a finding of deliberate indifference. (*Id.* at 4–11.) The Court finds that Defendants' arguments are well-taken.

As an initial matter, the parties do not dispute that Plaintiff's knee injury was an objectively serious medical condition, and the Court finds that it was. *See, e.g.*, *Gaston v. Ghosh*, 498 F. App'x 629, 632 (7th Cir. 2012) (unpublished) (knee injury that caused severe pain and was recognized by treaters as requiring further evaluation and treatment was a serious medical condition for the purposes of an Eighth Amendment claim).

In considering the adequacy of Dr. Obaisi's care, the Court must look at the totality of his treatment of Plaintiff. *Petties*, 836 F.3d at 728–29. Plaintiff has not brought forth any evidence that Dr. Obaisi's treatment decisions were "so far afield of accepted professional standards as to raise the inference that [they were] not actually based on a medical judgment." *Dean*, 18 F.4th at 241. Plaintiff points to his self-report of a tearing sensation during his first visit with Dr. Obaisi

as a reason why Dr. Obaisi should have immediately ordered an MRI and/or referred him to a specialist. But Plaintiff admittedly has no medical training, and his unsupported belief that he should have received different care does not raise an issue of fact. *See Bishop v. Wexford Healthcare*, No. 21-3014-CSB, 2022 WL 16626814, at *4 (C.D. Ill. Aug. 29, 2022) (plaintiff's "uneducated belief" that he should have received MRI earlier was "of little consequence") (citing *Walker v. Zunker*, 30 F. App'x 625, 628 (7th Cir. 2022) (unpublished) ("[A] prisoner's self-serving opinion of the quality of treatment is insufficient to raise a genuine issue of material fact.")).

Plaintiff further contends that the fact that he received some medical treatment does not shield Defendants from liability because the care he received was blatantly inappropriate. (*See* Pl.'s Mem. in Resp. to Defs.' Mot. for Summ. J., Dkt. 145 at 8.) In support of this, he cites *Perez v. Fenoglio*, 792 F.3d 768 (7th Cir. 2015), in which the Seventh Circuit held that a prisoner who suffered a torn ligament, an open dislocation of his thumb, and a "gaping wound" in his hand stated a claim against a prison physician because he "alleg[ed] with specificity a number of troubling delays in his treatment." *Perez*, 792 F.3d at 774, 778. These included: a 24-hour wait to see a doctor in the first instance, a further wait of four days to see a specialist (at which time it was too late to suture the wound), and a 10-month delay from the time of his injury until surgery. *See id.* at 778. The treating physician in *Perez* also allegedly ignored recommendations from the specialist and made a sarcastic comment that an Ace bandage would substitute for a splint, which indicated that the physician was not exercising his medical judgment in determining treatment. *Id.* at 778–79.

*Perez* stands for the proposition that prison treaters' provision of some continuing care does not scuttle a claim for deliberate indifference. *Id.* at 777. The appeals court elaborated:

> If all the Eighth Amendment required was that prison officials provide some "immediate and ongoing attention," they could shield themselves from liability

> (and save considerable resources) by shuttling sick or injured inmates to perfunctory medical appointments wherein no meaningful treatment is dispensed. Needless to say, the responsibilities imposed by the Constitution are not so easily avoided.

*Id.* Plaintiff likens his case to *Perez* because, he contends, he waited more than two years to see a specialist and experienced considerable delays before he "received meaningful treatment in the form of surgery." (*See* Pl.'s Mem. in Resp. to Defs.' Mot. for Summ. J., Dkt. 145 at 8.)

*Perez* is distinguishable from the instant case for a number of reasons, including that it was decided at the pleading stage rather than with the benefit of a fuller record on summary judgment, that it involved an acute condition (an open wound requiring sutures and an open dislocation), and that the treating physician was alleged to have ignored the recommendations of a specialist. In this case, Plaintiff was by his own account suffering from a chronic condition, and Dr. Obaisi died prior to Plaintiff's treatment by Dr. Bodner, so there are necessarily no allegations that Dr. Obaisi refused to follow any of the specialist's recommendations.

The instant case is more similar to *Grant v. Heidorn*, 802 F. App'x 200 (7th Cir. 2020) (unpublished), in which a state prisoner who injured his knee playing basketball sued three primary care doctors at his prison for refusing to order an MRI or orthopedic consultation for his left knee, despite his consistent complaints of pain. The prisoner, who ultimately received knee-replacement surgery, contended that the prison physicians were deliberately indifferent by continuing an ineffective course of treatment for years. *Grant*, 802 F. App'x at 201.

In that case, the first treater, Dr. Heidorn, began treating the plaintiff for knee pain in June 2009. *Id.* At that point, the plaintiff requested an MRI and an orthopedic consult, and told Dr. Heidorn of the suspected meniscal tear and that the injury had been bothering him since 1999. *Id.* Dr. Heidorn observed that the knee was stable with no effusion, diagnosed chronic knee pain, and ordered an x-ray, nonsteroidal anti-inflammatory drugs (NSAIDs), and a knee sleeve. *Id.*

18

After a follow-up x-ray in June 2009 showed mild degenerative changes to the knee, Dr. Heidorn met with the plaintiff and diagnosed him with moderately advanced degenerative joint disease. *Id.* He recommended "ice, a knee sleeve, NSAIDs, and glucosamine supplements." *Id.* At that point, the plaintiff did not complain of knee pain again until January 2010, when he requested and received a "no kneel" order. *Id.* at 201–02.

A subsequent x-ray in March 2010 showed no significant changes. *Id.* at 202. Plaintiff's medical records showed "no further complaints of knee pain until May 2011 when he requested more ice." *Id.* Another knee x-ray taken in July 2011 "again showed no significant progression of degenerative joint disease." *Id.* Dr. Heidorn did not request an MRI because he believed the x-rays provided a baseline to evaluate the progression of the disease, and because the x-ray results did not warrant it. *Id.* Dr. Heidorn did, however, order a physical therapy evaluation and appointments. *Id.*

Throughout five years, the defendant doctor provided various types of conservative treatment, including a low-bunk permit, in-cell meals, ice, medication, and physical therapy. *Id.* Years later, in October 2016, after conservative treatment by two other prison doctors, an MRI showed several degenerative knee conditions. *Id.* at 204. An orthopedic specialist ultimately diagnosed osteoarthritis and an "incidental" meniscal tear in the knee. *Id.* Plaintiff ultimately had a knee replacement surgery. *Id.*

In affirming the grant of summary judgment for Dr. Heidorn and two other treating physicians, the Seventh Circuit observed that a decision "to persist with ineffective treatment and ignore a patient's repeated complaints of unresolved pain" can raise a question of fact as to deliberate indifference. *Id.* at 204. Further, "[i]nexplicable delay" that unnecessarily prolongs an inmate's suffering can amount to deliberate indifference. *Id.*

But in holding that summary judgment was nonetheless appropriate, the Seventh Circuit observed that the prisoner plaintiff had brought forth no evidence that the prison physicians' decisions were based on something other than their professional judgment or were "blatantly inappropriate." *Id.* at 205. Further, there was no evidence that the treaters had misdiagnosed the prisoner's condition, and even if they had, "failing to correctly diagnose a condition is evidence of negligence, not deliberate indifference." *Id.* (citing *Cesal v. Moats*, 851 F.3d 714, 724 (7th Cir. 2017)). The appeals court further pointed out that the crux of the plaintiff's complaint was that he wanted an orthopedic consultation and an MRI much sooner than he received them. *Id.* The court observed, however, that "[a]n MRI is simply a diagnostic tool, and the decision to [forgo] diagnostic tests is a "classic example of a matter for medical judgment."' *Id.* (quoting *Pyles*, 771 F.3d at 411); *see also Lloyd v. Moats*, 721 F. App'x 490, 494 (7th Cir. 2017) (unpublished) ("[A] delay in ordering tests must be evaluated in light of the entire record to determine if it evinces deliberate indifference . . . ."). Further, even if the plaintiff's treaters had failed to choose the best course of treatment, that did not amount to deliberate indifference. *Id.*

Similar considerations warrant summary judgment in this case. Plaintiff has not brought forth evidence that Dr. Obaisi's treatment decisions were based on something other than his professional judgment. He contends that Dr. Obaisi rejected his request for an MRI because it had to be approved by other people (apparently a reference to the collegial review board) and they would not do so unless he tried other methods first. But notably, even by Plaintiff's account, Dr. Obaisi said an MRI was not needed because his injury was a sprain. Even if Dr. Obaisi had considered Wexford's alleged reluctance to approve an MRI without trying other treatment options, this does not indicate that he knowingly chose to pursue an ineffective course of treatment. *See Munson v. Ahmed*, No. 18-cv-2216-DWD, 2022 WL 747444, at *10 (S.D. Ill. Mar. 11, 2022)

(even if administrative and cost concerns played a part in denial of prisoner's requests for MRI, that did not show deliberate indifference where record otherwise indicated that treating physician relied on his medical judgment in choosing other treatment); *see also Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006) ("The cost of treatment alternatives is a factor in determining what constitutes adequate, minimum-level medical care, but medical personnel cannot simply resort to an easier course of treatment that they know is ineffective.") (citation omitted).  Further, even if Dr. Obaisi initially misdiagnosed Plaintiff's condition, such a misdiagnosis would be evidence of negligence, not deliberate indifference.

Plaintiff paints a picture of nearly three years of continuous suffering during which Dr. Obaisi refused to provide adequate treatment and likens his case to those in which prison treaters have continued to pursue an ineffective course of treatment.  The record reflects, however, that Plaintiff at times went long stretches without seeking medical attention for his injured knee.  For example, after receiving the first steroid injection on Feb. 17, 2016, Plaintiff did not seek treatment of the knee again until May 11, 2016.  After the May 23, 2016, steroid injection, Plaintiff did not return to nurse sick call with reported knee pain until April 18, 2017, nearly 11 months later.  Plaintiff faults Dr. Obaisi for failing to set up a follow-up appointment in six months after that steroid injection, but the record is clear that Plaintiff understood the process to obtain medical treatment and was able to use that process to request to go to nurse sick call if he was experiencing pain.  (*See*, *e.g.*, Pl.'s Dep., Dkt. 137-1 at 24:4–25:21; 47:7–48:4.)  After the final steroid shot, on May 9, 2017, Plaintiff did not seek additional treatment until Nov. 7, 2017.

Additionally, Plaintiff reported on at least two occasions that the steroid injections to his knee had helped his pain, at one point telling P.A. Williams during an April 20, 2017, appointment that the steroid shot had "worked great."  This indicates that the conservative treatment provided

by Dr. Obaisi afforded Plaintiff at least some relief and was not completely ineffective, as Plaintiff asserts. *Cf. Bailey v. Wexford Health Ind. LLC.*, No. 2:19-cv-00082-JMS-DLP, 2021 WL 598292, at *9 (S.D. Ind. Feb. 16, 2021) (treating physician was not obligated to base treatment decisions on prisoner's statement that he had a torn muscle and needed an MRI, but was obligated to consider the amount of pain reported "and the fact that his conservative treatment measures were ineffective across the board"). The fact that Plaintiff continued to experience some pain does not indicate that Dr. Obaisi was deliberately indifferent. *See Leiser v. Hoffman*, No. 20-2908, 2021 WL 3028147, *3 (7th Cir. July 19, 2021) (unpublished) ("[D]octors are not deliberately indifferent when they are unable to eliminate completely a patient's pain.") (citing *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996)). And as late as Nov. 7, 2017, about a month before Dr. Obaisi referred Plaintiff for an orthopedic consultation, an examination at nurse sick call showed that Plaintiff did not have bruising, redness, or swelling, and had a full range of motion.

The Court sets forth these facts not to minimize Plaintiff's pain, but to demonstrate that the treatment provided to Plaintiff did provide some relief, and the need for treatment by a specialist was not blatantly obvious, as Plaintiff contends. In sum, Plaintiff has not brought forth any evidence that Dr. Obaisi's treatment decisions were such a significant departure from professional standards as to raise a question of fact as to whether he was actually exercising his professional judgment.

Further, Defendants are correct that Plaintiff has not presented evidence that any delay in referring him to an orthopedic specialist caused him harm. *See Langston v. Peters*, 100 F.3d 1235, 1240–41 (7th Cir. 1996) ("[A]n inmate who complains that delay in medical treatment rose to a constitutional violation must place *verifying medical evidence* in the record to establish the detrimental effect of delay in medical treatment to succeed.") (citations omitted). Plaintiff has not

22

brought forth any evidence that an earlier visit to an orthopedic surgeon would have alleviated his knee pain. In fact, he testified that he still felt the same way he did before the surgery. In the absence of any medical evidence showing otherwise, no reasonable jury could conclude that any delay in referring Plaintiff to a specialist prolonged Plaintiff's pain. *See Brown v. Kelley*, No. 19-CV-1761-bhl, 2022 WL 376236, at *5 (E.D. Wis. Feb. 8, 2022) (no evidence of causation where prisoner was left in same position of "having to manage chronic, severe knee pain" after MRI diagnosed source of pain).

Because Plaintiff has not raised a question of fact as to Dr. Obaisi's liability, the Court need not consider whether punitive damages are available against his estate. Summary judgment is granted in favor of Dr. Obaisi's estate.

Next, as to Wexford, Plaintiff argues that Dr. Obaisi was an official with "final policymaking authority" who caused his injury. Plaintiff, however, has not brought forth evidence that Dr. Obaisi had final policymaking authority for Wexford as to any particular issue. This analysis is distinct from whether Dr. Obaisi had control over Plaintiff's treatment decisions, including whether to refer him to a specialist or for an MRI. *See Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 664 (7th Cir. 2016) (medical director had final say as to prisoner's treatment plan, but that was not enough to show that he was final policymaker for purposes of *Monell* liability); *Von Ryburn v. Obaisi*, No. 14 CV 4308, 2022 WL 1444309, at *14 (N.D. Ill. May 6, 2022) (collecting cases finding that prison medical directors did not qualify as final policymakers because they were expected to follow Wexford's policies and procedures); *see also Pyles v. Shearing*, No. 3:13-CV-770, 2019 WL 4307307, at *12 (S.D. Ill. Aug. 21, 2019), *report and recommendation adopted*, No. 3:13-CV-770, 2019 WL 4305496 (S.D. Ill. Sept. 11, 2019) (fact that medical director had final say on whether to refer prisoner for outside treatment did not

make him final policymaker for *Monell* purposes). Further, even if Dr. Obaisi was a final policymaker, Plaintiff has not brought forth evidence raising a question of fact as to his deliberate indifference, so any *Monell* claim that hinges on his individual liability necessarily fails. *Whiting*, 839 F.3d at 664.

Plaintiff also claims that Wexford had an "unofficial, widespread custom or practice" of delaying MRI scans. (*See* Pl.'s Mem. in Resp. to Defs.' Mot. for Summ. J., Dkt. 145 at 15.) But Plaintiff points only to his own experience in which he states that he was denied requested MRIs on five occasions (once by P.A. Williams, who did not have authority to order an MRI). This is insufficient to show a widespread custom or practice because "what is needed is evidence that there is a true municipal policy at issue, not a random event." *Hildreth v. Butler*, 960 F.3d 420, 426–27 (7th Cir. 2020) (citations omitted) (finding that three instances of prescription delays over nineteen months involving one inmate did not qualify as widespread unconstitutional practice); *see Grieveson v. Anderson*, 538 F.3d 763, 774 (7th Cir. 2008) (evidence of four incidents experienced by plaintiff alone did not show widespread unconstitutional practice); *Brady v. Wexford Health Sources, Inc.*, No. 3:17-CV-883-MAB, 2021 WL 4262430, at *18 (S.D. Ill. Sept. 20, 2021) (eight instances over about four years in which prescription refills were delayed were "not enough to foster a genuine issue of material fact"). Similarly, in this case, Plaintiff has not presented evidence of a widespread practice of denying or delaying MRI scans based on his own experience.

In short, Plaintiff has not shown a constitutional problem with his care, nor has he shown any evidence that he was injured due to an institutional policy. In such circumstances, there is no municipal liability. *See Johnson v. Prentice*, 29 F.4th 895, 905 (7th Cir. 2022) (dismissing *Monell* claim that "suffer[ed] from two deficiencies: there is no proof of an underlying constitutional

24

violation by any individual Wexford defendant nor any evidence that an institutional policy caused such a violation"); *see also Ray v. Wexford Health Sources, Inc.*, 706 F.3d 864, 866 (7th Cir. 2013) (holding it was unnecessary to determine Wexford's policy on MRI scans because plaintiff failed to establish constitutional problem with his treatment and did not suffer actionable injury from policy attributed to Wexford). For these reasons, summary judgment will be granted in favor of Wexford.

Final judgment will be entered in favor of Defendants. If Plaintiff wishes to appeal, he must file a notice of appeal with this Court within 30 days of the entry of judgment. *See Fed. R. App. P.* 4(a)(1)(A). If Plaintiff appeals, he will be liable for the $505.00 appellate filing fee regardless of the appeal's outcome. *See Evans v. Ill. Dep't of Corr.*, 150 F.3d 810, 812 (7th Cir. 1998). If the appeal is found to be non-meritorious, Plaintiff could be assessed a "strike" under 28 U.S.C. § 1915(g). If a prisoner accumulates three "strikes" because three federal cases or appeals have been dismissed as frivolous or malicious, or for failure to state a claim, the prisoner may not file suit in federal court without pre-paying the filing fee unless he is in imminent danger of serious physical injury. 28 U.S.C. § 1915(g). If Plaintiff seeks leave to proceed *in forma pauperis* on appeal, he must file a motion for leave to proceed *in forma pauperis* in this Court stating the issues he intends to present on appeal. *See Fed. R. App. P.* 24(a)(1).[13]

---

[13] Plaintiff need not bring a motion to reconsider this Court's ruling to preserve his appellate rights. However, if Plaintiff wishes the Court to reconsider its judgment, he may file a motion under Federal Rule of Civil Procedure 59(e) or 60(b). Any Rule 59(e) motion must be filed within 28 days of the entry of this judgment. *See Fed. R. Civ. P.* 59(e). The time to file a motion pursuant to Rule 59(e) cannot be extended. *See Fed. R. Civ. P.* 6(b)(2). A timely Rule 59(e) motion suspends the deadline for filing an appeal until the Rule 59(e) motion is ruled upon. *See Fed. R. App. P.* 4(a)(4)(A)(iv). Any Rule 60(b) motion must be filed within a reasonable time and, if seeking relief under Rule 60(b)(1), (2), or (3), must be filed no more than one year after entry of the judgment or order. *See Fed. R. Civ. P.* 60(c)(1). The time to file a Rule 60(b) motion cannot be extended. *See Fed. R. Civ. P.* 6(b)(2). A Rule 60(b) motion suspends the deadline for filing an appeal until the Rule 60(b) motion is ruled upon only if the motion is filed within 28 days of the entry of judgment. *See Fed. R. App. P.* 4(a)(4)(A)(vi).

## **CONCLUSION**

Defendants' motion for summary judgment (Dkt. 135) is granted. The Clerk is directed to enter final judgment for Defendants and against Plaintiff. This case is closed.

DATE: 3/27/23

_____
Nancy L. Maldonado
United States District Judge